**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHRISINDA KETTERER,

        Plaintiff,                            Case No. 06-11773

vs.

                                              HONORABLE GERALD E. ROSEN

JO ANNE B. BARNHART,                  HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.    BACKGROUND**

Chrisinda Ketterer brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be GRANTED IN PART and Defendant's motion for summary judgment be DENIED, with this matter being remanded for further proceedings.

    **A.    Procedural History**

Plaintiff originally filed an application for DIB on September 7, 2003, claiming disability since March 30, 2003, due to herniated discs in her thoracic spine, bulging discs with spurs in cervical spine and pain following lumbar spine surgery (R. 38-40, 45). This claim was denied on September 23, 2005, after a July 27 hearing by Administrative Law Judge (ALJ) Larry B. Parker (R. 14-21). On March 14, 2006, the Appeals Council denied Plaintiff's request for review (R. 3).

**B.      Background Facts**

**1.      *Plaintiff's Hearing Testimony***

At the hearing Plaintiff testified that she was born on September 10, 1957, had completed high school and had no subsequent education, licenses or certifications (R. 247).

Her last employment was as a meat wrapper at Farmer Jacks and before this as a production worker with a temporary agency (both of which required lifting 50 pounds) (R. 259-60).  Before these positions Plaintiff worked as an assembler with a fabricator (which required lifting 20 pounds) (R. 260).

Plaintiff stopped working March 30, 2003, due to an injury to her thoracic and lower spine (R. 249).  She felt she was unable to work due to pain in her thoracic, cervical and lumbar spine (R. 250).  The pain in her neck sometimes radiated to her arms down to her elbows (R. 251).  The lower back pain was sharp and "grabbing" and sometimes radiated into her hips and legs.  Plaintiff specifically felt she could not return to work as an assembler because it involved a lot of repetitive hand work (R. 260-61).

Plaintiff's husband handled the grocery shopping, though she was able to shop for a "few items at a time" herself (R. 252).  He also completed the yard work and the heavy housework.  Plaintiff was able to complete light housework, such as dusting and picking up.  She could complete these activities for an hour and a half before she need to stop to rest.  She usually laid down for 20-30 minutes.  She drove once or twice a week (R. 257).

Plaintiff described her sleep as "terrible" (R. 253).  She required Vicodin to sleep and took pain medication during the day.  The pain medication eased but did not completely dissipate the pain  The pain mediation also made her sleepy.  She took two to three 45 minute to one hour naps each

2

day (R. 254). Plaintiff could sit one half hour to 45 minutes, stand 20-30 minutes, walk 20-30 minutes, and lift a gallon of milk. Plaintiff could walk stairs with the aid of the railing, but had trouble bending at the waist, squatting, pushing/pulling and reaching overhead (R. 255-56).

She had a July 2003 EMG which showed carpal tunnel syndrome (R. 256). She noticed this when it "flares up." If she did repetitive movements like stirring a cake or turning on the car ignition the pain would "shoot in." Because she is right-handed, she notices the carpal tunnel in her right hand (R. 257). She also had numbness in her fingers and thumbs and sometimes woke with numbness in both hands. She had trouble opening lids on jars. She rated her energy level as a 3/10. Her most comfortable position was laying on her back with her knees bent and applying ice.

Plaintiff had an low back MRI the week before the hearing due to increasing back pain (R. 262). Her doctor wanted to try epidural injections for the pain, and wanted the MRI first to rule out the need for surgery. She also indicated that surgery for her cervical and thoracic regions had been discussed, but was currently not contemplated (R. 263).

When asked whether she could perform a job that allowed her to sit and stand at her leisure, such as a mall information desk clerk handing out brochures and answering questions or a security monitor watching a screen, Plaintiff explained that she could not imagine that she could do this eight hours a day, five days a week because of her need to lie flat on her back several times during the day (R. 261-62).

### 2. *Medical Evidence*

An April 12, 2003, thoracic spine MRI revealed right paramedian disc protrusion/extrusions at the T7-T8 to T9-T10 levels with effacement of the ventral thecal sac and thoracic cord; and a left paramedian disc protrusion at the T6-T7 level effacing the ventral thecal sac and thoracic cord (R.

240).

On April 16, 2003, Plaintiff was evaluated for physical therapy and reported that in March 2003 she had begun feeling mid-back pain while pushing a meat cart at work (R. 142). The therapist noted that Plaintiff's MRI showed bulging discs at T-4 through T-6 levels and a CT scan was significant for osteoarthritis in the low back. Plaintiff reported sharp shooting pain in mid-back which increased with prolonged sitting or use of left arm; she was in her third week of a five-week sick leave. She rated her pain as 6-7/10 which increased to 8-9/10 with increased lifting or arm motions. Plaintiff's neurological examination was within normal limits (R. 143), but she was found to have decreased thoracic range of motion which limited her ability to perform activities of daily life and job duties (R. 144).

On April 30, 2003, Plaintiff was seen by James C. Culver, M.D. (R. 151). Dr. Culver opined that Plaintiff's pain was secondary to disc herniations of T6-7, T7-8, T8-9, T9-10 with left thoracic radiculitis and degenerative disc disease. Plaintiff was to begin a course of epidural steroid injections. Although asked, Dr. Culver declined to offer any opinion regarding Plaintiff's ability to perform work-related activities and instead deferred to Plaintiff's treating physician for such an opinion (R. 147).

On May 5, 2003, Plaintiff was seen by Dr. Culver complaining of pain in the midthoracic area and radiating towards the left shoulder blade and occasionally into the anterior chest wall (R. 148). Dr. Culver reviewed the April 12, 2003, thoracic spine MRI and noted the multiple disc protrusions/extrusions. Upon examination Dr. Culver found tenderness of the thoracic spinal midline primarily at about the T7-8 level. There were some subtle sensory abnormalities with pin prick testing in the left thoracic dermatome approximating the T7 level and some tenderness over the

inferior aspect of the left scapular region (R. 149). No other sensory, motor or reflex abnormalities were detected (R. 150). Dr. Culver diagnosed disc herniation of T6-7 on the left and T7-8, T8-9 and T9-10 on the right, symptoms of thoracic radiculitis and degenerative disc disease of the thoracic spine.

On May 27, 2003, Plaintiff visited Dr. Sankaran for a check-up (R. 110). Plaintiff reported that she was supposed to return to work, but had consulted with an attorney who arranged for her to see a neurologist regarding her dorsal disc herniation, because there was "no way" she could go back to her regular job. Plaintiff explained that she did not want to have surgery, that physical therapy and injection treatment had not helped her. Upon examination, Plaintiff had tenderness over her dorsal spine with muscle spasm present and exhibited difficulty bending, kneeling and squatting. Dr. Sankaran advised Plaintiff to stay off of work for two weeks and avoid heavy lifting, bending, lifting, turning or twisting.

On June 10, 2003, Plaintiff was seen by Dr. Sankaran and continued to complain of back pain (R. 109). She reported that she had not received any relief from physical therapy or steroid injections, needed a stronger pain medication and did not wish to return to work based on the advice of her attorney. Physical examination revealed tenderness in the dorsal spine lumbar area with muscle spasm and decreased flexion and extension, but no radiculopathy in the arms or legs. Dr. Sankaran diagnosed herniated disc in the dorsal spine at T6-T7, T7-T8, T8-T9, and T9-T10.

On June 25, 2003, Plaintiff was examined by neurologist Jeffrey R. Levin, M.D. (R. 114-15). Plaintiff reported that her back pain began in January 2003 and she complained of burning pain behind her shoulder blades, tightness in her chest and some substernal chest pain (R. 114). Plaintiff denied fatigue, weight loss, fever, depression or any other problems, although she did complain of

some urinary retention since she began having chest pain. Her neurological examination was essentially normal (R. 115). Plaintiff's motor examination revealed significant tenderness throughout the thoracic spine and some radicular pain in the distribution of the axillary nerves and mild hyperreflexia in her lower extremities. Her sensory examination was intact, and she was able to perform rapid alternating and fine movements. Plaintiff's gait was normal and she was able to heel, toe, and tandem walk without difficulty. Plaintiff's Romberg sign was negative and she had no obvious focal weakness in her upper extremities. Dr. Levin diagnosed multilevel thoracic disc herniation with some spinal cord compression. He prescribed pain management medication and a neurosurgical consult and asked Plaintiff to contact him if she developed numbness or weakness in the lower extremities.

A July 3, 2003, cervical spine MRI showed discogenic and spondylitic change from C3-C4 through C6-C7 (R. 156). On September 8, 2003, Dr. Levin reviewed this July 3 cervical spine MRI and found that it showed degenerative disc disease and disc bulging at several levels at C4-5, C5-6, and C6-7, with significant impingement of the thecal sac at the C5-6 level, although the neural foramina appeared to be open (R 155). Dr. Levin also indicates that a July 1, 2003, EMG revealed thoracic disc herniation and carpal tunnel syndrome in the right hand. Plaintiff complained of some radicular symptoms into her upper extremities, which Dr. Levin believed was related to the multiple level disc disease, though EMG testing did not find significant changes. Plaintiff denied any sensory deficits. On exam, Dr. Levin found some weakness of the biceps bilaterally, right greater than left, with 4+/5 strength on the right and 5-/5 strength on the left, multiple thoracic tenderness to palpation, mild weakness with dorsiflexion in the left foot and pain with straight leg raising. There were no sensory deficits or reflex changes noted in the lower extremities. Dr. Levin diagnosed

carpal tunnel syndrome, cervical radiculopathy, thoracic disc herniation and probable lumbar radiculopathy.

A September 15, 2003, lumbar spine MRI revealed small to moderate right paramedian/posterolateral L4-L5 herniated nucleus pulposus (HNP) combined with anterolateral right epidural granulation tissue/scar causing mild mass effect upon the right anterolateral thecal sac and right lateral recess narrowing with a possible partially inferiorly sequestered, caudally extruded disc fragment, without central spinal canal stenosis (R. 170). There was underlying edema of the right L5 nerve root and small to moderate broad-based disc extrusion vs. small HNP at L5-S1 combined with bulge and facet disease to cause bilateral lateral recess narrowing, effacement of the thecal sac, and central spinal stenosis. Also present, moderate inferior right and mild to moderate left L4-L5 foraminal stenosis from the combination of disc and posterior marginal osteophyte with facet arthropathy.

September 23, 2003, EMG testing confirmed L5- S1 radiculopathy (R. 153).

On October 13, 2003, Dr. Levin reviewed Plaintiff's April and September 2003 MRI films of the thoracic and cervical spine. He found:

- multiple level disc herniation, most prominent at T6-7, T7-8, T8-9, and T9-10;
- compression predominantly on the right side compressing the exiting nerve roots on the right, also compressing the thecal sac on the right at those levels – worst at T8-9 and T9-10
- recurrent disc herniation at L4-5;
- edema of the right L5 nerve root;
- disc herniation at L5-S1, causing bilateral neural foraminal stenosis;
- L4-5 neural foraminal stenosis on the left
- significant disc disease, most prominent at C5-6 and C6-7 with some disc herniation and compression of the thecal sac at those levels

(R. 161).

At this time Plaintiff complained mainly of neck and thoracic pain and severe headaches,

which Dr. Levin believed were caused by her cervical disc herniations.

On October 29, 2003, Plaintiff underwent a consultative examination with S.L. Schuchter, M.D., at the request of the state agency (R. 192-94). Upon examination, Plaintiff had slight periarticular thickening about both knees, slight crepitation on flexion of both knees and some paraspinal muscle spasm in the neck and lower back (R. 193). Plaintiff's grip strength was 24 kilograms in the right hand and 28 kilograms in the left hand, she was able to pick up coins with both hands and her nervous system was intact. There was also evidence of decreased range of motion in the cervical and lumbar spine (R. 184).

On November 5, 2003, a state agency physician reviewed the medical evidence of record and opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand/walk and sit six of eight hours each day and push or pull without limitation (R. 196). The doctor further opined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch or crawl and her statements regarding her limitations were only partially credible (R. 198, 201).

On December 29, 2003, Plaintiff was seen by Wilfredo Rivera, M.D. for complaints of lightheadedness when standing up or sitting up (R. 160). Dr. Rivera examined Plaintiff and concluded that her episodes of lightheadedness might be secondary to using hydrochlorothiazide and therefore decreased her dosage.

On September 7, 2004, Plaintiff returned to Dr. Sankaran for a regular check-up (R. 225). She reported that she had been feeling good since her last check-up in February. Plaintiff explained that she still had back pain and had been seeing Dr. Levin for this complaint.

On September 22, 2004, Plaintiff underwent bilateral endoscopicplantar fasciotomies to treat her complaints of foot pain (R. 208-09). Plaintiff did well following the surgery with no

complications, discomfort, pain or disability (R. 211). On October 4, 2004, Plaintiff's sutures were removed and she was allowed to return to normal activities. On November 16, 2004, Plaintiff reported that she did feel that she had returned to 100% function, only 50% (R. 211).

On January 19, 2005, Plaintiff was seen by neurologist Wilbur J. Boike, M.D. (R. 231). The record indicates that Dr. Boike had previously performed an independent medical examination for Plaintiff and was now seeking to begin a treatment relationship because "her worker's compensation litigation is likely to be settled in the relatively near future, and she is interested in undergoing whatever type of rehabilitative care was necessary to maximize her outcome so that she can become more physically active" (R. 231). Plaintiff's examination revealed normal strength in both lower extremities, both proximally and distally, with reduced thoracic and lumbosacral spinal flexibility. Dr. Boike opined that Plaintiff would benefit from an aggressive and comprehensive spinal reconditioning program.

On February 16, 2005, Dr. Boike reported that Plaintiff's participation in physical therapy had improved her condition considerably (R. 234). Plaintiff reported that her strength, endurance, posture and activity level had improved and noted some reduction in back pain. Examination revealed normal strength in lower extremities and a minimal decrease in lumbosacral spine flexibility.

On March 7, 2005, Plaintiff was discharged from physical therapy with a moderate improvement in low back pain and assigned a home exercise program (R. 236). Plaintiff reported a 50% overall improvement and indicated that she was able to watch grandchildren without increasing symptoms and that she had increased her strength and functional mobility. On March 16, 2005, Plaintiff reported to Dr. Boike that she was following her home exercise program only

sporadically and experienced some ongoing fluctuating mid and low back pain, though she felt her functional capabilities had improved (R. 237).

On March 24, 2005, Plaintiff complained of a spot on the bottom of her foot which was painful upon palpation (R. 213). Plaintiff complained of increased pain with activities, walking and standing and pain with weight-bearing. Plaintiff was treated with injections but continued to experience pain through April 2005 (R. 214).

On April 20, 2005, Dr. Boike started Plaintiff on Zoloft, after she appeared tearful during her examination (R. 238). Plaintiff reported fluctuating "'cramping' mid-back discomfort". Physical examination revealed normal strength in both lower extremities and a slight decreased in thoracic spine flexibility. Dr. Boike encouraged Plaintiff to continue her home exercise program and indicated that he continued to recommended work restrictions (though he did not specify what these restrictions were). During a follow up visit, Plaintiff reported that she had only taken one Zoloft pill, felt ill, and had not taken any since (R. 239). Yet, her spirits were not that bad. She continued to report fluctuating back discomfort. Dr. Boike recommended that if Plaintiff returned to work, she should avoid repetitive bending and twisting as well as heavy lifting.

On April 21, 2005, Dr. Levin examined Plaintiff, who complained of chronic neck, back and thoracic pain (R. 215). Dr. Levin found Plaintiff to have some weakness of her biceps (right greater than left), positive Tinel's sign and thenar weakness (greater in the right) with thenar atrophy. Plaintiff exhibited tenderness in the thoracic region at approximately T8-T10, with some axillary radicular pain and weakness of dorsiflexion in the left foot and pain with straight leg raising. Dr. Levin diagnosed carpal tunnel syndrome and cervical and thoracic radiculopathy. Dr. Levin referred Plaintiff for a sleep study due to her chronic headaches and hypertension and added Zonegran for

pain management.

### 4. *Vocational Evidence*

Mary Williams served as the vocational expert (the "VE") in this matter (R. 267). VE Williams qualified Plaintiff's past work as follows: meat clerk, medium exertional level and unskilled; plastic fabricator, medium exertional level (though performed by Plaintiff as light) and semi-skilled (R. 268). VE Williams testified that, if Plaintiff's testimony were taken as controlling and credible, she could not perform her past work nor any work at any exertional level due to her need to lie down three to four times each day for 45 minutes to an hour (R. 268-69).

ALJ Parker posed a hypothetical to VE Williams involving a younger individual with at least twelve years of education and the following limitations: lifting 20 pounds occasionally and 10 pounds frequently; able to stand, sit or walk six of eight hours a day; limited pushing and pulling; needs to avoid repetitive bending and twisting; and occasional postural limitations (R. 269).

VE Williams testified that such a hypothetical person could perform Plaintiff's past work as a plastic fabricator. When ALJ Parker added a limitation for lifting only five pounds, VE Williams testified that this would decrease the level of exertion below sedentary.

### 5. *The ALJ's Decision*

ALJ Parker found that Plaintiff met the non-disability insured requirements of the Act on her alleged onset date and that she had not engaged in substantial gainful activity since March 30, 2003 (R. 19).

Plaintiff was severely impaired, as defined in the regulations, by disc herniation of he lumbar and thoracic spines; cervical and thoracic radiculopathy; carpal tunnel syndrome, worse on the right; neuromas of the feet, bilaterally; and obesity (R. 19-20). Plaintiff's hypertension, hyperlipidemia,

asthma, headaches and anxiety were under control with medication and exercise and were, therefore, non-severe (R. 20). Plaintiff's hearing loss and vision were corrected with devices and were also, therefore, non-severe. The severe impairments did not meet or medically equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. 404 1520(d)) (the "Listing").

Plaintiff's allegations regarding her impairments were not fully credible based on 12 enumerated reasons (R. 18-19). Plaintiff had the residual functional capacity ("RFC") to lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk six hours in an eight hour day and sit six hours in an eight hour day (R. 20).

Plaintiff's past work as a assembler/plastics/fabricator did not require performance of work-related activities precluded by her RFC. Therefore, Plaintiff was not disabled at any time through the date of the decision.

## II.    ANALYSIS

### A.    Standards Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*,

800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[1]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.   Factual Analysis

Plaintiff raises two challenges to the Commissioner's decision: (1) the ALJ erred in not finding Plaintiff's impairment met Listing 1.04A and (2) the ALJ erred in determining her RFC.

#### 1.   *Listing 1.04A*

To meet or equal a Listing, Plaintiff's condition must manifest all of the elements of that particular listing.  *See Nunn v. Bowen*, 828 F.2d 1140, 1144 (6th Cir.1987); *Hale v. Secretary of Health and Human Services*, 816 F.2d 1078, 1083 (6th Cir.1987).  Further, "[a] social security disability claimant bears the ultimate burden of proof on the issue of disability."  *Richardson v. Heckler*, 750 F.2d 506, 509 (6th Cir.1984).

Listing 1.04 requires:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal

---

[1] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

>stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
>A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by **sensory or reflex loss** and, if there is involvement of the lower back, positive straight-leg raising test (**sitting and supine**)

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.04A (emphasis supplied).

Plaintiff's medical records reveal one arguable finding of sensory abnormality on May 5, 2003 – consisting of "some subtle sensory abnormality with pin prick testing in the left thoracic dermatome . . . . [and no other] sensory, motor or reflex abnormalities" (R. 149-50) – and no evidence of a sustained sensory loss and no evidence at all of reflex loss.[2]  Further, though there is evidence in the record to indicate that Plaintiff had a positive straight leg test in September 2003 and again in April 2005 (R. 155, 215), Plaintiff did not provide documentation, as required by the Listing, that this test was performed both sitting and supine.  Therefore, Plaintiff failed to meet the burden of showing that her impairment manifested all the elements of Listing 1.04A.

### 2. *The ALJ's RFC Determination*

Plaintiff argues that because ALJ Parker found her carpal tunnel to be a severe impairment he was required to include in his RFC determination limitations pertaining to carpal tunnel syndrome – because he did not, and because he presented the RFC without any carpal tunnel limitations to VE Williams, Plaintiff argues, VE Williams' opinion that Plaintiff could perform her past work as a plastics fabricator could not be relied on as substantial evidence.

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.00D indicates that "because abnormal findings may be intermittent, their presence over time must be established . . .".

The term "severe" is defined in the Regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities". 20 C.F.R. § 404.1520. ALJ Parker did find Plaintiff's carpal tunnel syndrome to be a severe impairment (R. 19).

This is not the usual case where the ALJ enumerated all of the claimant's impairments and stated that she had a combination of impairments which were collectively severe. Rather, ALJ Parker took the time to separate out those impairments which he found to be severe "as defined in the Social Security Act" and not severe (R. 19-20), thus leading one to conclude that those impairments designated as severe, such as carpal tunnel syndrome, significantly limited Plaintiff's physical ability to do basic work activities.

A hypothetical question may omit non-severe impairments, *Benenate v. Schweiker,* 719 F.2d 291, 292 (8th Cir. 1983), but not impairments found by the ALJ to be severe, *Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985). In the present case the RFC presented to VE Williams did not include any limitations for Plaintiff's carpal tunnel syndrome, despite the fact that ALJ Parker found this to be a severe impairment. ALJ Parker relied on vocational testimony that Plaintiff could perform her past work as a plastics fabricator, despite Plaintiff's undisputed testimony that this job required a great deal of repetitive hand work. Therefore, the ALJ's determination that Plaintiff can perform her past work is not supported by substantial evidence.

Defendant's arguments on this topic all speak to the fact that the objective medical evidence does not support Plaintiff's allegation of severe carpal tunnel syndrome or disabling limitations based on her carpal tunnel syndrome. This argument has some appeal given the facts that Plaintiff did not list carpal tunnel syndrome on the list of impairments in her disability application and rarely

15

if ever complained of carpal tunnel related symptoms to her doctors, her doctors did not prescribe carpal tunnel related restrictions and the state agency physicians did not find her carpal tunnel to be severe. Yet, the fact remains that the ALJ found Plaintiff's carpal tunnel syndrome to be severe and this Court is not at liberty to ignore this fact or rewrite his decision, despite the fact that the record may support a contrary finding. *Mullen*, *supra*, 800 F.2d at 545.

There is evidence in the record to support the ALJ's finding of severe carpal tunnel syndrome, i.e. the objective medical evidence confirming the diagnosis and Plaintiff's testimony regarding the resulting limitations. Therefore, the ALJ's finding cannot be overturned. Yet, the hypothetical question upon which the ALJ relied did not include or otherwise accommodate Plaintiff's severe carpal tunnel syndrome. Accordingly, the VE's response to a flawed hypothetical question cannot provide substantial evidence to support ALJ Parker's ultimate decision.

### III.   RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment be GRANTED IN PART, with this matter being remanded for further proceedings. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931

F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: March 30, 2007                              s/Steven D. Pepe
Flint, Michigan                                    United States Magistrate Judge


## Certificate of Service

I hereby certify on March 30, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Janet L. Parker, Esq. and Mikel E. Lupisella, Esq.

                                                                 s/Tammy Hallwood
                                                                  Deputy Clerk
                                                                  U.S. District Court
                                                                  600 Church St.
                                                                  Flint, MI 48502
                                                                  810-341-7850